IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

v.                                              Criminal No. 3:18cr7 (DJN)

ROBERTO JARAMILLO,
    Petitioner.

### MEMORANDUM OPINION

Petitioner Roberto Jaramillo ("Petitioner" or "Jaramillo"), a federal inmate proceeding

*pro se*, filed this 28 U.S.C. § 2255 Motion ("§ 2255 Motion," (ECF No. 55)), moving the Court

to vacate, set aside, or correct his sentence for wire fraud.  Petitioner contends that the following

grounds entitle him to relief:[1]

| | |
|---|---|
| Claim One | "[Jaramillo is] actually innocent of committing wire fraud." (*Id.* at 4.) |
| Claim Two | "Counsel was ineffective for failing to research the relevant law showing that [Jaramillo did] not have the *mens reas* to commit the offense and it's factually impossible to commit the *actus reus* of the crime." (*Id.* at 5.) |
| Claim Three | "Counsel was ineffective for not informing [Jaramillo] of [his] right to trial by judge and telling [him] that [he] would have to testify at trial to prove [his] innocence." (*Id.* at 6.) |
| Claim Four | "Counsel was ineffective for not compelling the prosecution to ask for a downward departure in [Jaramillo's] case." (*Id.* at 8.) |
| Claim Five | "Counsel was ineffective for failing to provide a financial affidavit from Oscar Salazar." (ECF No. 55-1, at 1.) |
| Claim Six | "Counsel was ineffective for failing to object to the sentencing enhancement for deriving more than $1,000,000.00 in gross receipts from a financial institution." (*Id.* (emphasis omitted).) |

---

[1]    The Court employs the pagination assigned by CM/ECF docketing system to the parties'
submissions.  The Court corrects the capitalization, punctuation, and spelling in the quotations
from Petitioner's submissions.  The Court corrects the emphasis in the quotations from
Petitioner's submissions.

Claim Seven          The Government committed "misconduct in attempting to pressure Lori Gill to change her testimony and in intimidating Oscar Salazar from testifying at the sentencing hearing." (*Id.* at 2.)

The Government filed a response asserting that Petitioner's claims were, in part, defaulted, and otherwise lack merit. (Mem. of the United States in Resp. to Pet.'s Mot. To Vacate, Set Aside, or Correct Sentence ("Govt's Mem.") (ECF No. 64).) Petitioner filed a reply. (Pet's Mem. in Reply to United States Mot. to Deny Pet's § 2255 Pet. (ECF No. 66).) For the reasons stated herein, Claim One will be DISMISSED, because it lacks merit. Claims Two, Three, Four, Five and Six will be DISMISSED, because Petitioner has failed to demonstrate that he received ineffective assistance of counsel. Claim Seven will be DISMISSED as procedurally defaulted.

## I.   PROCEDURAL HISTORY

On January 22, 2018, the Government charged Petitioner through a criminal information with one count of wire fraud in violation 18 U.S.C. § 1343. (ECF No. 1.) On January 30, 2018, Petitioner waived indictment by a grand jury (ECF No. 9) and entered into a written Plea Agreement (ECF No. 11) and Statement of Facts (ECF No. 10) with the Government. That same day, Petitioner appeared before a Magistrate Judge for a plea hearing. (ECF No. 60, at 1-2.) Petitioner testified under oath and pled guilty. (ECF No. 13, at 1.)

The Magistrate Judge found that Petitioner knowingly and voluntarily pled guilty and that an independent basis in fact supported the plea. (ECF No. 60, at 24-25.) The Magistrate Judge accepted Petitioner's guilty plea and set the matter for sentencing. (*Id.* at 25-27.) Petitioner's conditions of bond required that, *inter alia*, he notify any current or future employers of his felony conviction and "refrain from employment with access to any personal identifiers/financial information/currency or funds." (ECF No. 14, at 2.)

2

Following Petitioner's plea hearing, the probation officer generated a Presentence Investigation Report ("PSR"). (ECF No. 28.) Pursuant to his Plea Agreement, Petitioner received a three-level reduction for acceptance of responsibility. (*Id.* ¶¶ 6, 32, 33.) This reduction led to Petitioner receiving a Total Offense Level of 20, a Criminal History Category of I, and an advisory guidelines range of 33 to 41 months of imprisonment. (*Id.* ¶¶ 88-89.)

On May 16, 2018, Petitioner appeared before the Honorable Robert E. Payne, United States District Judge, for sentencing. (ECF No. 61.) The Court began to hear arguments on Petitioner's Motion for a Variance (ECF No. 27), but ultimately decided to continue the matter to July 12, 2018, so that: (1) Petitioner's bankruptcy counsel could file his Chapter 11 plan with the Bankruptcy Court; (2) Petitioner could provide proof of employment and details concerning his ability to pay restitution; and, (3) the parties could gather more information about what actions, if any, the Virginia State Corporations Commission ("VSCC") might take, which could potentially impact Petitioner's ability to secure/retain employment.[2] (ECF No. 61, at 4-37.)

On May 23, 2018, the Court received a Notice of Employment Status from Petitioner. (ECF No. 33.) Among other things, Petitioner stated that, on May 18, 2018, his employer at that time, Alterra Home Loans ("AHL") terminated him. (*Id.* at 1.) Petitioner stated that following the hearing on May 16, 2018, representatives from the VSCC advised AHL "that it faced a potential fine for failing to notify the agency of Mr. Jaramillo's conviction in this case." (*Id.*) Petitioner stated that he "remain[ed] committed to exploring all avenues for continuing his employment in order to repay his restitution obligations." (*Id.*)

---

[2]    At one point during the hearing, Judge Payne stated that he was "inclined to believe" that a "protracted period of home confinement and employment may be an appropriate sentence contrary to [his] general view that . . . white collar criminals . . . ought to go to jail for protracted period of time," provided that Petitioner was able to "work and pay off . . . restitution." (ECF No. 61, at 29.)

On June 11, 2018, the Government filed a Motion to Order Defendant to Show Cause Why His Bond Should Not be Revoked. (ECF No. 36.) Among other things, the Government stated that Petitioner had not adequately notified his employer, AHL, of his felony conviction and he had improperly gained access to personal identifiers and financial information of clients. (*Id.* at 1-5.) On June 14, 2018, after a hearing on the matter, the Magistrate Judge revoked Petitioner's bond. (ECF No. 42, at 1.)

On June 28, 2018, Petitioner submitted a Supplemental Verification of Employment Status. (ECF No. 43.) Petitioner stated that, despite being incarcerated, he had secured a position with Millennium International Group, LLC. ("MIG"), and that he could make $130,000.00 per year upon his release from custody. (*Id.* at 1; ECF No. 43-1, at 2.)

On July 2, 2018, agents of the Federal Bureau of Investigations ("FBI") interviewed Oscar Salazar, the President of MIG. (ECF No. 44-2, at 1.) Salazar, a former used car salesman, had worked for Petitioner at Trust Mortgage. (*Id.*) When asked to provide details of MIG's business, Salazar admitted that "there really was no group," and that he was "the only individual currently associated" with the entity. (*Id.* at 3.) Salazar revealed that MIG "does not currently have any employees or business operations." (*Id.*) According to Salazar, MIG had only "prospective" business projects, and the only assets held by MIG were Salazar's personal bank account and a line of credit on Salazar's residence. (*Id.*) Salazar stated that if he "were to liquidate all of his assets," he "could obtain $130,000." (*Id.*) Salazar stated that he could pay Petitioner a salary for only a few months, but that if, after that, Petitioner failed to perform, he would have to terminate Petitioner's employment. (*Id.*) Salazar stated that he formed MIG on June 4, 2018, and that "[t]he idea for the company was based on conversations between Salazar and Jaramillo prior to Jaramillo's incarceration." (*Id.*) In short, MIG was a start-up company "in the initial stages of development," that had "no employees, no current projects, no clients and no

4

capital (other than Salazar's personal capital . . . )." (*Id.* at 4.)  The interview of Salazar took place "at his office," at a business called Prospera Home Loans.  (*Id.* at 1.)

On July 12, 2018, Petitioner again appeared for sentencing.  (ECF No. 62, at 1.) Petitioner's bankruptcy attorneys had not filed a plan with the Bankruptcy Court, as they could not perform the necessary calculations, because Petitioner had lost his job with AHL, and it was unclear whether he would be available to work for MIG.  (*Id.* at 8-9.)  Petitioner's attorney asked the Court to sentence him to twelve months of home confinement.  (*Id.* at 13.)  The Court, after hearing arguments from counsel, denied Petitioner's Motion for a Variance.  (*Id.* at 24.)  Counsel then asked the Court to sentence Petitioner at the low-end of the guidelines.  (*Id.*)

Before pronouncing the sentence, the Court gave Petitioner an opportunity to speak.  (*Id.* at 25.)  Petitioner said "I'm sorry for all the trouble that this has caused and I will work hard to see the restitution [will] be paid . . . ."  (*Id.*)  The Court sentenced Petitioner to 33 months of incarceration, the low end of the guidelines, and $696,654.29 in restitution.  (*Id.* at 25, 27.)

Petitioner did not appeal.

## II.    ACTUAL INNOCENCE

In Claim One, Petitioner alleges that he is "actually innocent of committing wire fraud." (ECF No. 55, at 4.)  Petitioner contends that:

> It [wa]s factually impossible for [Jaramillo] to manipulate the wires, when all wire request[s] were keyed in correctly by my former employee, Lori Gill.  Only Wells Fargo Bank had the power to manipulate the wire and wire the money from the escrow account to my operating account . . . .  The Gov[ernment] can't provide proof . . . that I physically deviated the wires.

(*Id.*)  In a nutshell, Petitioner's argument is that he "is in prison because of a [series of] bank mistake[s]."  (ECF No. 66, at 2.)

5

As an initial matter, it is unclear whether habeas petitioners may raise freestanding actual innocence claims.[3] *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (citation omitted) ("[The Supreme Court] [has] not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."). Nevertheless, "[c]laims of actual innocence, whether presented as freestanding ones, or merely as gateways to excuse a procedural default, should not be granted casually." *Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir. 1998) (citations omitted).

Further, the Supreme Court has "described the threshold for any hypothetical freestanding innocence claim as 'extraordinarily high.'" *House v. Bell*, 547 U.S. 518, 555 (2006) (quoting *Herrera v. Collins*, 506 U.S. 390, 417 (1993) (finding that "whatever burden a hypothetical freestanding innocence claim would require," even a petitioner who "cast considerable doubt on his guilt — doubt sufficient to satisfy [the] gateway standard for obtaining . . . review despite a . . . default," would likely not satisfy it).

Here, the Court reviews Petitioner's arguments under the more lenient standard for gateway actual innocence claims, because if Petitioner satisfies this standard, the Court would be permitted to consider the merits of Claim Seven, his otherwise procedurally defaulted claim. Even under the more lenient standard for gateway actual innocence claims, Petitioner may obtain review of his claims "only if he falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'" *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995) (alteration in original) (citation omitted).

---

[3]     With respect to whether a habeas petitioner may raise a freestanding claim of actual innocence, "Fourth Circuit authority on this issue is inconclusive and conflicting." *Hazel v. United States*, 303 F. Supp. 2d 753, 760 (E.D. Va. 2004) (citing *Royal v. Taylor*, 188 F.2d 239, 243 (4th Cir. 1999); *Hunt v. Dade*, No. 98-6808, 2000 WL 219755, at *2 (4th Cir. Feb. 25, 2000)).

A gateway claim requires a petitioner to present "*new* reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Id.* at 324 (emphasis added). "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Id.* If a petitioner meets the burden of producing new, truly reliable evidence of his or her innocence, the Court then considers "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial,'" and determines whether the petitioner has met the standard for a gateway claim of innocence. *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327-28).

In that instance, the Court would be charged with determining "whether 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Sharpe v. Bell*, 593 F.3d 372, 377 (4th Cir. 2010) (quoting *Schlup*, 513 U.S. at 327-28). However, "[t]he Court need not proceed to this second step of the inquiry unless the petitioner first supports his or her claim with evidence of the requisite quality." *Hill v. Johnson*, 2010 WL 5476755, at *5 (E.D. Va. Dec. 30, 2010) (citing *Weeks v. Bowersox*, 119 F.3d 1342, 1352-53 (8th Cir. 1997); *Feaster v. Beshears*, 56 F. Supp. 2d 600, 610 (D. Md. 1999)).

Finally, "actual innocence" means factual innocence and not just legal insufficiency. *See Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (alteration in original) (citations and internal quotation marks omitted) ("[T]he miscarriage of justice exception is concerned with actual as compared to legal innocence.").

A.      **Relevant Evidence Presented to the Court**

Petitioner stipulated that had the matter gone to trial, the Government would have proved

the following facts beyond a reasonable doubt:

> From in or about October 2015 through in or about June
> 2016, within the Eastern District of Virginia and elsewhere, the
> defendant, ROBERTO JARAMILLO, knowingly devised and
> intended to devise a scheme and artifice to defraud, and for
> obtaining money and property by means of materially false and
> fraudulent pretenses, representations to Ameris Bank, did
> knowingly and unlawfully transmit and cause to be transmitted by
> means of wire communication in interstate or foreign commerce,
> writings, signs, and signals for the purpose of executing the
> scheme and artifice, which affected Ameris Bank, a financial
> institution, in violation of 18 U.S.C. § 1343.
>
> <u>General Allegations</u>
>
> At all times relevant to the Criminal Information, the
> defendant, ROBERTO JARAMILLO, was a resident of Richmond,
> Virginia, and the owner of Trust Mortgage LLC, and Trust Title
> Services LLC.  JARAMILLO was a licensed mortgage broker with
> the Commonwealth of Virginia.
>
> *Trust Mortgage*
>
> Trust Mortgage LLC ("Trust Mortgage") was located in
> Richmond, Virginia, and operated from in or about December
> 2007 until it ceased operations in or about December 2016.
>
> Trust Mortgage brokered loans or offered them as a
> correspondent lender.  A correspondent lender funds loans from a
> warehouse line of credit at a different financial institution.  Trust
> Mortgage had a warehouse line of credit at Ameris Bank, a
> financial institution, which enabled Trust Mortgage to extend loans
> to client borrowers.
>
> In order to exercise this Ameris Bank line of credit, Trust
> Mortgage, through JARAMILLO, had to certify that all funds
> advanced on the line of credit would be maintained in an escrow
> account.  Trust Mortgage's agreement with Ameris Bank, signed
> by JARAMILLO, required that the funds would be disbursed only
> in accordance with the settlement sheet, known as the Housing and
> Urban Development Form 1, or HUD-1.  Ameris Bank also
> prohibited Trust Mortgage from making monthly payments on the
> pending loans.
>
> *Trust Title*
>
> Trust Title Services LLC ("Trust Title") was located in
> Richmond, Virginia, and operated from in or about December
> 2010 until it ceased operations in or about December 2016.  Trust
> Title performed closings or settlements for sales, purchases, and
> refinances of real estate.  When a real estate settlement involved a

8

purchase, Trust Title was required to conduct a settlement transferring the lien on the property from one lender to another. When a settlement involved a refinancing, Trust Title was required to conduct a settlement transferring the lien on the property from one lender to another.

As part of the settlement for each real estate transaction, Trust Title collected funds from a buyer or refinancer and the buyer's or refinancer's lender to finance the purchase or refinancing of real estate. Trust Title was required to disburse collected funds to satisfy existing liens and mortgages on the property in the manner set forth on the HUD-1.

Sometime before September 2015, JARAMILLO opened an escrow account ending in 8633 ("Account 8633") for Trust Title at Wells Fargo Bank. JARAMILLO and Employee 1 were signatories on the account. JARAMILLO's approval was required to make any wire transfers out of Account 8633.

In or about April 4, 2011, Trust Title entered into an agreement with a title insurance company, Old Republic National Title Insurance Company ("ORNTI"). From in or about April 4, 2011 to in or about December 2016, ORNTI provided title insurance for real estate transactions conducted by Trust Title. The title insurance issued by ORNTI insured customers of Trust Title against financial loss from defects in title to real property and from the invalidity or unenforceability of mortgage loans.

In order to provide title insurance to customers of Trust Title for real estate transactions, ORNTI required Trust Title to maintain a federally-insured escrow account separate from any other bank account maintained by Trust Title, which escrow account was Account 8633. Pursuant to Trust Title's agreement with ORNTI, which was signed by JARAMILLO, Trust Title was permitted to use that escrow account only to receive money from real estate purchases or refinances and to use that money to pay out any required disbursements with those real estate purchases or refinances. Trust Title also was required to reconcile its escrow account every month.

<u>Scheme and Artifice to Defraud</u>

From in or about October 2015 through in or about June 2016, JARAMILLO misappropriated funds from loans that Trust Mortgage brokered or offered as a correspondent lender. These funds were deposited into JARAMILLO's Trust Title Account 8633, but JARAMILLO knowingly and intentionally failed to disclose to Ameris Bank and another financial institution, as well as ORNTI, that he was not disbursing those funds in the manner set forth on the HUD-1. In truth and fact, as JARAMILLO well knew, JARAMILLO transferred the funds to himself, paying business expenses and outstanding debts on prior real estate transactions for which JARAMILLO had not made proper disbursements.

9

### Manner and Means of the Scheme to Defraud

It was part of the scheme to defraud that JARAMILLO maintained control over the escrow account of Trust Title, Account 8633.

It was further part of the scheme to defraud that JARAMILLO approved all incoming and outgoing wires for Account 8633.

It was further part of the scheme to defraud that JARAMILLO maintained sole control over the Trust Mortgage's Wells Fargo business account ending in 8512.

It was further part of the scheme that from [at] least September 2015 through in or about June 2016, client borrowers obtained loans from Trust Mortgage, either as a broker or correspondent lender, using funds from Trust Mortgage's warehouse line of credit at Ameris Bank.

It was further part of the scheme to defraud that JARAMILLO caused Ameris Bank and other financial institutions to disburse funds into Trust Title Account 8633 on behalf of the client-borrowers who were purchasing real estate or refinancing their mortgages.

It was further part of the scheme to defraud that for seven real estate transactions, JARAMILLO did not use the funds in Account 8633 provided by Ameris Bank and other financial institutions for their intended purposes (as listed on the HUD-1s for those real estate transactions).

It was further part of the scheme to defraud that JARAMILLO concealed from ORNTI that the funds provided by Ameris Bank and other financial institutions did not remain in Account 8633 and were not disbursed in accordance with the HUD-1.

It was further part of the scheme to defraud that JARAMILLO instead transferred the funds from Account 8633 to his Trust Mortgage business account ending in 8512, whereafter he paid business expenses and outstanding debts on prior real estate transactions for which JARAMILLO had not made proper disbursements.

It was further part of the scheme to defraud that JARAMILLO concealed shortfalls in Account 8633 by using funds from new real estate transactions to pay liens from prior real estate transactions.

It was further part of the scheme to defraud that JARAMILLO used his own money to pay monthly mortgage payments on client-borrowers[¹] mortgages (that had not closed as directed on the HUD-1).

It was further part of the scheme to defraud that JARAMILLO fraudulently listed payments (in the forms of checks and wires) in Trust Title's disbursement statements that JARAMILLO prepared for real estate transactions, even though

Trust Title, through JARAMILLO, had not actually made the required payments.

*Example: Client Borrower #1*

For example, Client Borrower #1 sought to refinance his home in the Eastern District of Virginia in or about October 2015. Client Borrower #1 had a lien on his home from Bank B.

Client Borrower #1 obtained financing through Trust Mortgage, which in turn obtained the funds from its warehouse line of credit at Ameris Bank. It was further part of the scheme to defraud that on or about October 28, 2015, Ameris Bank wired through interstate commerce $298,980 to Trust Title's Escrow Account 8633. Trust Title, through JARAMILLO, should have used these funds, in large part, to pay off Client Borrower #1's lien from Bank B.

It was further part of the scheme to defraud that JARAMILLO — instead — knowingly and intentionally diverted these funds through numerous wire transfers and used them for other purposes. On or about October 29, 2015, JARAMILLO authorized a wire transfer of $287,354.87 from Trust Title's Escrow Account 8633 to Trust Mortgage's Wells Fargo account ending in 8512.

It was further part of the scheme to defraud that JARAMILLO, in turn, commingled this $287,354.87 with other funds in Account 8512 and used it for unauthorized expenses, including Trust Mortgage payroll and business expenses.

It was further part of the scheme to defraud that because Client Borrower #1's lien from Bank B was not paid off, monthly payments continued to come due. Between December 2015 and June 2016, JARAMILLO knowingly and intentionally made monthly wire transfers of approximately $1,926 from the Wells Fargo Trust Title Operating Account ending in 1215 — on which he was the sole signatory — to Bank B.

Client Borrower #1 continued to receive correspondence from Bank B and realized that his original lien had not been paid off. Client Borrower #1 then called JARAMILLO several times for explanations. JARAMILLO told Client Borrower #1 that he was working on it, that Bank B had made a mistake, and that he would resolve it. JARAMILLO did not tell Client Borrower #1 the truth, which was that JARAMILLO had taken his funds from the refinance loan, diverted them to his Trust Mortgage payroll, and was using it for unauthorized business expenses.

*A Bank Discovers the Fraud*

In or about June 2016, a bank contacted JARAMILLO regarding its concerns about irregularities in a real estate closing.

Thereafter, JARAMILLO's scheme to defraud collapsed.

In total, JARAMILLO's fraud and intended fraud on Ameris Bank and another bank is $1,259,610.55.

11

> JARAMILLO committed the offense herein knowingly,
> voluntarily, and without mistake or accident.

(ECF No. 10, at 1-8 (paragraph numbers omitted) (emphasis in original).)  In his Plea Agreement,

Petitioner expressly agreed to the following:

> The defendant will plead guilty because the defendant is in
> fact guilty of the charged offense.  The defendant admits the facts
> set forth in the statement of facts filed with this plea agreement and
> agrees that those facts establish guilt of the offense charged beyond
> a reasonable doubt.  The statement of facts, which is hereby
> incorporated into this plea agreement, constitutes a stipulation of
> facts for purposes of Section 1B1.2(a) of the Sentencing
> Guidelines. . . .
> The United States and the defendant agree that the
> defendant has assisted the government in the investigation and
> prosecution of the defendant's own misconduct. . . .

(ECF No. 11, at 2-3 (paragraph numbers omitted).)

When Petitioner appeared before a Magistrate Judge for a plea hearing, he was placed

under oath. (ECF No. 13, at 1.)  Petitioner testified that he understood the elements of wire fraud

and that, by pleading guilty, he was admitting those elements.  (ECF No. 60, at 5-6.)  Petitioner

acknowledged the Statement of Facts that he had signed.  (*Id.* at 16.)  The Magistrate Judge

asked Petitioner, "is th[at] what happened?"  (*Id.* at 17.)  Petitioner replied, "[y]es, Your Honor."

(*Id.*)  Petitioner testified that he was pleading guilty because he was in fact guilty.  (*Id.* at 11-12.)

The Magistrate Judge asked Petitioner, "do you understand that by pleading guilty you're . . .

saying that you committed the crime of wire fraud, and you can no longer then say that you did

not commit that crime, do you understand that?"  (*Id.* at 6.)  Petitioner replied, "[y]es, your

honor."  (*Id.*)

## B.   Petitioner's Purported Evidence of Innocence

In support of his claim of innocence, Petitioner has submitted two of his own "affidavits."

(ECF No. 55-1, at 5-14; ECF No. 66-2, 1-10.)  The two documents appear to be similar, except

that Petitioner did not sign the first version (ECF No. 55-1, at 14), whereas he did sign the

12

second version (ECF No. 66-2, at 10).  As discussed further in Section II.C., *infra*, neither

version of Petitioner's "affidavit" constitutes admissible evidence.[4]  (ECF No. 55-1, at 14; ECF

No. 66-2, at 10.)

In the signed version of his "affidavit," Petitioner states that he believes he is innocent of

wire fraud.  (ECF No. 66-2, at 6.)  Petitioner alleges that his employee, Lori Gill, keyed in the

wire transfers correctly and he "authorized them to the correct payoff beneficiaries."  (*Id.*)

Petitioner maintains that the money was "*inexplicably* diverted into [his] operating accounts."

(*Id.* at 2 (emphasis added).)  Petitioner contends that these multiple inexplicable fund transfers

into his operating resulted from "a possible mistake or bank error."  (*Id.* at 7.)

Petitioner freely admits that the funds from the wire transfers were "comingled with

operations funds, [and] the business was spending those funds on growth."  (*Id.* at 3.)  Petitioner

maintains that he did not notice the multiple deposits into his accounts, because his "escrow

reporting service . . . did not indicate any problems."  (*Id.* at 2.)   Petitioner states that he "was

not paying attention to the accounts," because he was "going through a difficult period in [his]

personal life."  (*Id.*)

Petitioner further admits that certain clients continued to get mortgage statements for

loans that "should have been paid off."  (*Id.* at 3.)  Petitioner admits that he paid those bills for

his clients.  (*Id.*)  Petitioner further states that he concealed these facts from ORNTI, because he

did not want to "lose [his] title operation for negligence."  (*Id.* at 4.)

Petitioner admits that when one of his investors "found out there were two mortgages on

a property," and called Petitioner to "find out what was going on," Petitioner "was not entirely

---

[4]     Petitioner references various emails, test messages, wire statements, and other documents
to support his claims.  (*See, inter alia*, ECF Nos. 66-6, 66-7, 66-8, 66-10, 66-11 and 66-16.)  The
Court has reviewed these documents in conjunction with Petitioner's "affidavits," even though
the affidavits themselves are lacking in reliability, as discussed in Section II.C., *infra*.

honest with them." (*Id.* at 5.) Petitioner said that he did not disclose to them that he "was making the payments on the old mortgages because the new notes were . . . [his] responsibility to fix." (*Id.*) At that point, Petitioner said he called ORNTI and "told them about the payoffs that were not made." (*Id.*)

Petitioner maintains that ORNTI "took full control" of his files and began "fraudulently sen[ding] money to the operating account and ordered [Petitioner] to wire funds . . . so their losses would be less." (*Id.* at 5-6.) Petitioner maintains that his banker, Octavio Wilson witnessed some of these transfers. (*Id.* at 6.) In short, Petitioner contends that ORNTI had actually "committed bank fraud and wire fraud," and not him. (*Id.* at 6.)

Petitioner contends that he brought all of this evidence to his attorneys prior to pleading guilty. (*Id.* at 6-7.) Petitioner maintains that he "resisted pleading guilty" and that his attorneys spoke to both Lori Gill and Octavio Wilson. (*Id.* at 7.) Nevertheless, Petitioner stated that he decided to plead guilty because his attorneys told him that he would "have a very small sentence or house arrest." (*Id.* at 10.)

In addition to his own "affidavits," Petitioner also submits an "affidavit" from Octavio Wilson, his former banker at Wells Fargo. (ECF No. 66-3, at 1-2.) Wilson states that on two dates Jaramilo and a representative of ORNTI came to his branch and requested that he "send some wires." (*Id.* at 2.) Wilson said that the ORNTI representative appeared to be the "one[] giving the instructions." (*Id.*) Finally, Wilson states that he "believe[s] that the deviated wires were a product of a system error or bank error." (*Id.*) As discussed below, the Wilson "affidavit" suffers from some of the same deficiencies as the Petitioner "affidavits."

### C. Reliability of Petitioner's "New" Evidence

The Supreme Court has explained that to be credible, three types of *"new* reliable evidence" may support a petitioner's allegations of innocence. *Schlup*, 513 U.S. at 324

14

(emphasis added).  These include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial."  *Id.*  Petitioner's actual innocence claim is not accompanied by "exculpatory scientific evidence," "trustworthy eyewitness accounts," or "critical physical evidence" that Petitioner did not have available to him when he entered his guilty plea.  *See id.*  Indeed, Petitioner puts forth no "new" information.  *Id.*  Quite to the contrary, Petitioner expressly states in his "affidavit" that he shared all the information that he now offers to the Court with his attorneys, and that his attorneys spoke with Ms. Gill and Mr. Wilson about his claims before he decided to plead guilty.  (ECF No. 66-2, at 6-10.)  For this reason alone, Petitioner's claim of actual innocence fails.  *Schlup*, 513 U.S. at 324.

Even if the Court ignores the obvious fact that Petitioner's claim of actual innocence does not stem from "new" evidence, as required by *Schlup*, Petitioner's claim would nevertheless fail, because Petitioner's "affidavits," which supply the basis for his claim, are not trustworthy, and therefore, do not constitute "reliable evidence."  *See id.*  Petitioner's first submission was not signed, and neither his first nor his second submission was notarized.[5]  While Petitioner did state that, "I, Roberto Jaramillo, under penalties of perjury do affirm the following is both true and accurate to my best information and belief" (ECF No. 66-2, at 1), such a statement does not suffice to transform the contents of the putative affidavit into sworn testimony.  *Price v. Rochford*, 947 F.2d 829, 832 (7th Cir. 1991) (refusing to consider documents verified in such a manner to avoid the penalty of perjury); *Hogge v. Stephens*, 2011 WL 2161100, at *2-3 & n.5

---

[5]       A document can be notarized in two primary ways.  An acknowledgment is used to verify a signature and to prove that an instrument was executed by the person signing it, whereas a jurat is evidence that a person has sworn to the truth of the contents of the document.  In an acknowledgment, unlike a jurat, the affiant does not swear under oath nor make statements under penalty of perjury.  *See Strong v. Johnson*, 495 F.3d 134, 140 (4th Cir. 2007) (explaining that jurat uses words "subscribed and sworn" and demonstrates an oath was rendered); *Goode v. Gray*, 2009 WL 255829, at *2 n.6 (E.D. Va. Feb. 3, 2009).

(E.D. Va. June 1, 2011) (treating statements sworn to under penalty of perjury, but made upon information and belief, as "mere pleading allegations") (quoting *Walker v. Tyler Cty. Comm'n*, 11 F. App'x 270, 274 (4th Cir. 2001)).

The Wilson "affidavit" suffers from similar deficiencies. While Wilson's submission bears a notary's seal, indicating that it had been acknowledged before a notary public, it does not contain a jurat. (ECF No. 66-3, at 1-2.) As such, the notary's acknowledgment merely verifies only that Wilson that executed the document; it does not indicate that Wilson swore to the truth of the contents of the document. *See Strong*, 495 F.3d at 140. Likewise, even though Wilson purports to make his declaration "under penalty of perjury," he qualifies that statement by indicating that his statements are "correct to [his] information and belief." (ECF No. 66-3, at 1.) As such, Wilson's "affidavit" constitutes nothing more than "mere pleading allegations." *Hogge*, 2011 WL 2161100, at *2-3 & n.5 (citation omitted).

Simply put, the circumstances in this instance do not demonstrate that either the Petitioner or Wilson "affidavits" are "trustworthy," such that they constitute "new reliable evidence." *Schlup*, 513 U.S. at 324; *see Calderon*, 523 U.S. at 559 (emphasizing that new reliable evidence is a "rarity"); *cf. United States v. Lighty*, 616 F.3d 321, 375 (4th Cir. 2010) ("Post-trial recantations of testimony are 'looked upon with the utmost suspicion.'" (quoting *United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir. 1973))). Even now, as Petitioner recants his prior sworn statements, he freely admits that he comingled ill-gotten funds that "inexplicably" appeared in his accounts with his own funds, that he used the comingled monies to grow his business, that he inappropriately paid monthly mortgage payments for clients on loans that should have been paid off, that he concealed these facts from ORNTI for fear of detection, and that he lied to an investor when confronted about the fact that a particular property had two mortgages on it. *See ante*, at 13-14.

16

To simply chalk up the "inexplicable" appearance of large sums of money in Petitioner's accounts, on multiple occasions, which Petitioner used for personal gain and actively concealed from others, as "possible mistake[s] or bank error[s]," defies both logic and reason. This is especially true in the face of Petitioner's own sworn statements at the Rule 11 hearing, which directly contradict Petitioner's latest self-serving account. *See United States v. Lemaster*, 403 F.3d 216, 221-22 (4th Cir. 2005) (holding that absent extraordinary circumstances sworn statements made at a Rule 11 plea hearing are "conclusively established").

Thus, in light of the unreliable provenance of both the Petitioner and Wilson "affidavits," Petitioner has not met his burden of producing new reliable evidence of his innocence, and the Court need not proceed to the second part of the inquiry for Petitioner's gateway actual innocence claim.[6] *See Hill*, 2010 WL 5476755, at *5 ("The Court need not proceed to this second step of the inquiry unless the petitioner first supports his or her claim with evidence of the requisite quality." (citing *Weeks*, 119 F.3d at 1352-53; *Feaster*, 56 F. Supp. 2d at 610)). Accordingly, Claim One will be DISMISSED.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

To demonstrate ineffective assistance of counsel, a convicted defendant must show, first, that counsel provided him with deficient representation and, second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of *Strickland*, the convicted defendant must overcome

---

[6]      Were the Court to reach the second step in the inquiry, it is clear that, given the totality of the evidence, Petitioner nevertheless fails to demonstrate that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" *Sharpe*, 593 F.3d at 377 (internal quotation marks omitted) (quoting *Schlup*, 513 U.S. at 327). Holding Petitioner's sworn statements at the Rule 11 hearing, which were "conclusively established," *see Lemaster*, 403 F.3d at 221-22, up against his current unsworn and somewhat incoherent statements to the contrary, leaves little doubt as to his guilt. Likewise, the addition of Wilson's speculative and unsworn statements would not change the relevant analysis.

the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, the Court need not determine whether counsel performed deficiently if the Court can readily dismiss the claim for lack of prejudice. *Id.* at 697.

In the context of a guilty plea, the Supreme Court has modified this second prong of *Strickland* to require the defendant to "show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). In the absence of extraordinary circumstances, the truth of the sworn statements made during a Rule 11 plea hearing is "conclusively established." *United States v. Lemaster*, 403 F.3d 216, 221-22 (4th Cir. 2005).

## A.     Claim Two

In Claim Two, Petitioner alleges that "[c]ounsel was ineffective for failing to research the relevant law showing that [Petitioner did] not have the *mens reas* to commit the offense and its factually impossible to commit the *actus reus* of the crime." (ECF No. 55, at 5.)

As an initial matter, it is unclear exactly what "relevant law," Petitioner believes his attorneys "fail[ed] to research," as Petitioner does not provide the Court with any specific citations. More importantly, this claim must fail, because it stands in direct contrast to Petitioner's own sworn statements during the Rule 11 plea hearing.

During the Rule 11 hearing, Petitioner stated that he understood the elements of wire fraud that the Government was required to prove and that, by pleading guilty, he was admitting

those elements. (ECF No. 60, at 5-6.) Petitioner expressly acknowledged the Statement of Facts that he had signed, which more than adequately demonstrates Petitioner's guilt in this instance, *see ante* at 7-11, to the Magistrate Judge. (*Id.* at 16.) The Magistrate Judge asked Petitioner, "is th[at] what happened?" (*Id.* at 17.) Petitioner said, "[y]es." (*Id.*) Petitioner agreed that by pleading guilty, he was "in effect saying that [he] committed the crime of wire fraud, and [he] [could] no longer then say that [he] did not commit that crime." (*Id.* at 6.) Petitioner admitted that he was pleading guilty because he was in fact guilty. (*Id.* at 11-12.) Petitioner additionally stated that he was "entirely satisfied with what [his] attorneys ha[d] done for [him]," that he had "a sufficient opportunity" to discuss the charges with his attorneys, as well as "any possible defenses" that may have been available to him, and that he believe[d] that [his] attorneys ha[d] done everything possible to help [him] make a decision about whether or not [he] should plead guilty." (*Id.* at 10-11).

Petitioner remains bound by his prior sworn statements during the Rule 11 plea hearing.[7] *See Lemaster*, 403 F.3d at 221-22 (holding that absent extraordinary circumstances sworn statements made during a Rule 11 plea hearing are "conclusively established"). Petitioner's newly-minted claims to the contrary are self-serving and conclusory, and do not constitute "clear and convincing evidence," or establish the sort of "extraordinary circumstances" that would require the Court to consider Petitioner's prior sworn statements during the Rule 11 plea hearing as anything other than truthful. *Lemaster*, 403 F.3d at 221-22. Consequently, Petitioner's prior sworn statements are "conclusively established." *Id.*

---

[7] This conclusion should come as no surprise to Petitioner, as he was explicitly warned about the consequences of his statements at the Rule 11 hearing prior to entering his guilty plea. (ECF No. 60, at 2.) The Magistrate Judge specifically admonished Petitioner, "once I accept your plea of guilty, you're going to be bound by the answers that you give me . . . do you understand that?" (*Id.*) Petitioner replied by saying, "[y]es, sir." (*Id.*)

19

As such, Petitioner has failed to show that counsel was deficient with regard to Claim Two, much less that he was prejudiced in any way.  Accordingly, Claim Two will be DISMISSED.

**B.     Claim Three**

In Claim Three Petitioner alleges that "[c]ounsel was ineffective for not informing [Petitioner] of [his] right to trial by judge and telling [him] that [he] would have to testify at trial to prove [his] innocence." (ECF No. 55, at 6.)  Claim Three fails for a variety of reasons.

As an initial matter, Petitioner's belief that he enjoyed a "right to trial by judge" is incorrect.  Under Federal Rule of Criminal Procedure 23(a), the default rule is that "trial must be by jury." Fed. R. Crim. P. R. 23(a).  A bench trial can only occur if the defendant waives his right to a jury in writing, the Government agrees to a bench trial, and the Court agrees to adjudicate the matter.  *Id.*  Thus, Petitioner has failed to show that counsel rendered deficient representation for failing to advise him about a "right" that he did not actually possess.

At most, Petitioner had a right to request a bench trial.  However, as Rule 23(a) demonstrates, Petitioner did not have the right to demand one.  As the Government points out, Petitioner has failed to demonstrate that the Government would have agreed to a bench trial in this instance.  (*See* ECF No. 64, at 11.)  Indeed, the Government asserts that they would not have consented to a bench trial. (*Id.*)  Similarly, Petitioner has failed to show that the Court would have been willing to approve his request for a bench trial.  Given Petitioner's failure to establish two of the three pre-conditions for a bench trial to occur, he has failed to establish prejudice in any event.

As for Petitioner's claim that counsel erred by "telling [him] that [he] would have to testify at trial to prove [his] innocence" (ECF No. 55, at 6), that portion of Claim Three is belied by Jaramillo's statements at the Rule 11 hearing.  The Magistrate Judge reviewed with Petitioner

20

the various constitutional rights that he was waiving by virtue of his plea, including the "right to remain silent at trial," and the "right to refrain from offering any evidence at trial." (ECF No. 60, at 8, 10.) Petitioner expressly stated that he understood the rights that he was waiving. (*Id.*) The Magistrate Judge asked Petitioner, "do you understand that you have the absolute right to . . . make the government prove this charge against you beyond a reasonable doubt?" (*Id.* at 10.) Petitioner responded by saying, "[y]es, Your Honor." (*Id.*)

Once again, there are significant discrepancies between Petitioner's latest allegations and his sworn testimony at the Rule 11 hearing. Petitioner continues to be bound by his sworn statements at the Rule 11 hearing. *See Lemaster*, 403 F.3d at 221-22 (holding that sworn statements made during a Rule 11 plea hearing are "conclusively established"). Consequently, Petitioner cannot now credibly argue that he did not know that he had the right to remain silent, produce no evidence, and require the Government to prove his guilt beyond a reasonable doubt at the time that he entered his plea. Thus, the Court need not decide whether counsel committed error in advising Petitioner about his right not to testify, because Petitioner has failed to demonstrate that he suffered any prejudice as a result. Accordingly, Claim Three will be DISMISSED.

### C.    Claim Four

In Claim Four, Petitioner alleges that a "downward departure is memorialized in [his] plea agreement," and that his "[c]ounsel was ineffective for not compelling the prosecution to ask for a downward departure" at sentencing. (ECF No. 55, at 8.)

As an initial matter, the Government disputes Petitioner's claim that his Plea Agreement contemplated a downward departure. (ECF No. 64, at 12.) Indeed, after reviewing Petitioner's

Plea Agreement (ECF No. 11), the Court can find no evidence that the parties included such a term in their agreement.[8] The Plea agreement did, however, contain the following clause:

> The United States and the defendant agree that the defendant has assisted the government in the investigation and prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently. If the defendant qualifies for a two-level decrease in offense level pursuant to U.S.S.G. § 3E1.1(a) and the offense level prior to the operation of that section is a level 16 or greater, the government agrees to file, pursuant to U.S.S.G. § 3E1.1(b), a motion prior to, or at the time of, sentencing for an additional one-level decrease in the defendant's offense level.

(*Id.* at 3.)

To the extent that Petitioner confuses the request for a "decrease in offense level" contemplated by this clause with a request for a downward departure, the Court can find no error with counsel for failing to address this point to either the prosecutor or the Court. As noted above, the probation officer, pursuant to the Plea Agreement, awarded Petitioner a three-level reduction for acceptance of responsibility in computing the PSR. (ECF No. 28 ¶¶ 6, 32, 33.) Consequently, Petitioner received everything that he bargained for, and it would have been frivolous for counsel to pursue that issue further.

However, to the extent that Petitioner maintains that he had an agreement with the Government to request a downward departure that the Plea Agreement did not reflect, here again, Petitioner's position is belied by his sworn statements during the Rule 11 hearing. The

---

[8] Petitioner points to paragraph 13(a) of the Plea Agreement to support his belief that the parties agreed to a request for a downward departure. (ECF No. 55, at 8.) However, this clause provides him with no support. Paragraph 13 spells out what would happen in the event of a breach of the Plea Agreement. (ECF No. 11, at 7-8.) Subsection (a) states that the Government "will be released from its obligations under this agreement, including any obligation to seek a downward departure or a reduction in sentence." (*Id.* at 7.) Subsection (a) does not state that the Government agreed to request a downward departure. (*Id.*) Nor is the concept mentioned anywhere else in the Plea Agreement.

Magistrate Judge asked Petitioner, "other than what's contained in [the Plea Agreement], did any law enforcement officer, the prosecutor, your attorney, or anyone else make you any threats or promises that are not contained in this document?" (ECF No. 60, at 12.) Petitioner responded by saying, "[n]o, Your Honor." (*Id.*)

Consequently, Petitioner has failed to show any deficiency on the part of counsel, much less that he suffered any prejudice as a result. Accordingly, Claim Four will be DISMISSED.

### D.   Claim Five

In Claim Five, Petitioner alleges that "[c]ounsel was ineffective for failing to provide a financial affidavit from Oscar Salazar" at sentencing. (ECF No. 55-1, at 1.)

As discussed above, Petitioner's sentencing hearing continued from May 16, 2018, to July 12, 2018, *inter alia*, so that Petitioner could provide evidence to substantiate his ability to pay restitution. (ECF No 61, at 26-37.) In the interim, the Court revoked Petitioner's bond for failing to disclose his felony conviction to his employer and for improperly having access to personal identifiers and financial information of clients. (ECF No. 42, at 1.) Before his second sentencing hearing, and despite being incarcerated, Petitioner submitted a document indicating that Salazar, the President of MIG, would willingly employ Petitioner on very favorable terms. (ECF Nos. 43, 43-1). Not surprisingly, FBI agents investigated Salazar's claim and generated a report concerning their findings. (ECF No. 44-2.) During their interview with Salazar, the agents uncovered a plethora of issues with MIG and the employment arrangement that Petitioner was proffering to the Court. *See supra* at 4-5. The investigation raised serious concerns about Salazar's ability to reliably pay Petitioner the salary that he had suggested to the Court. *Id.*

Given the highly questionable nature of the proposed arrangement between Salazar and Petitioner, and the fact that much information had already been introduced on the topic, the Court can hardly fault counsel for wanting to draw as little further attention to Salazar as

23

possible, for fear of further compromising an already tenuous position.  In any event, Petitioner has failed to show that counsel was deficient in this regard, much less that he suffered any resulting prejudice.  Accordingly, Claim Five will be DISMISSED.

      **E.**    **Claim Six**

      In Claim Six, Petitioner alleges that "[c]ounsel was ineffective for failing to object to the sentencing enhancement for deriving more than $1,000,000.00 in gross receipts from a financial institution." (ECF No. 55-1, at 1 (emphasis omitted).)  Petitioner does not contend that he took less than one million dollars in gross receipts from Ameris Bank.  Instead, without citing any authorities to support his position, Petitioner claims that Ameris Bank does not constitute a victim, because it had insurance to cover any losses.  (*Id.*)  As the Government correctly points out, this argument lacks merit.  (ECF No. 64, at 15-16.)

      The relevant inquiry here is whether Petitioner received one million dollars or more in gross receipts from Ameris Bank.  U.S.S.G. § 2B1.1(b)(17)(A).  The term "gross receipts" means "any property, real or personal, tangible or intangible, which is obtained, directly or indirectly, as a result of [the] offence."  18 U.S.C. § 982(a)(4).  The term does not specify an offset for any monies recouped from an insurance company or other third party.  Thus, the Court looks to the "gross" amount of property that was obtained as a result of committing the offense.  In the Statement of Facts, Petitioner admitted that, "[i]n total, JARAMILLO's fraud and intended fraud on Ameris Bank . . . is $1,259,610.55." (ECF No. 10, at 8.)  Petitioner remains bound by sworn statements at the Rule 11 hearing.  *Lemaster*, 403 F.3d at 221-22.

      Given this fact, it would have been frivolous for counsel to have objected to the guidelines enhancement under § 2B1.1(b)(17)(A).  As such, Petitioner has failed to show that counsel was deficient, much less that he suffered any prejudice.  Accordingly, Claim Six will be DISMISSED.

## IV. PROCEDURAL DEFAULT

The procedural default rule bars Claim Seven from review here, absent a showing of cause and prejudice or actual innocence, because Petitioner could have raised, but did not raise, this claim on direct appeal. *See Bousley v. United States*, 523 U.S. 614, 622-23 (1998); *see also United States v. Linder*, 552 F.3d 391, 397 (4th Cir. 2009) (internal quotation marks omitted) (citation omitted) (explaining that on collateral review a petitioner who waives the right to appeal "is precluded from raising claims that are the sort that *could have* been raised on appeal"). Petitioner seems to contend that the perceived ineffective assistance of counsel constitutes cause to excuse his default of this claim. (ECF No. 66, at 19-20.) That contention lacks merit for the reasons discussed below. *Cf. United States v. Frady*, 456 U.S. 152, 167-68 (1982) (noting that when applying the dual standard of cause and prejudice courts need not examine the issue of cause, if prejudice is clearly lacking).

### A.     Claim Seven

In Claim Seven, Petitioner alleges that the Government committed "misconduct in attempting to pressure Lori Gill to change her testimony and in intimidating Oscar Salazar from testifying at the sentencing hearing." (ECF No. 55-1, at 2.) To prove a viable claim of prosecutorial misconduct a defendant must demonstrate "that the [Government]'s . . . conduct w[as] improper and, second, the defendant must show that such . . . conduct prejudicially affected his substantial rights so as to deprive him of a fair trial." *United States v. Scheetz*, 293 F.3d 175, 185 (4th Cir. 2002) (citation omitted). Petitioner has failed to demonstrate that any misconduct occurred or that counsel erred by deciding not to address the issue to the Court.

With regard to Petitioner's former employee, Lori Gill, Petitioner alleges that the Government committed misconduct by "interviewing Lori Gill four times and ask[ing] her the same questions over and over." (ECF No. 66, at 19.) Petitioner does not submit an affidavit

from Gill, or any other sort of first-hand account to substantiate his allegations. Petitioner does

not even provide any details (i.e., names, dates, places, conditions, etc.) concerning any of the

circumstances surrounding Gill's putative interactions with the Government, nor does he

mention what questions he believes were objectionable or explain why. Rather, in a wholly

conclusory fashion, Petitioner states only that "Gill was feeling a little pressure" and that it was

"almost as if the agents wanted to get a different answer." (*Id.*)

These vague assertions do not suffice to show that any sort of impropriety occurred. *See*

*Sanders v. United States*, 373 U.S. 1, 19 (1963) (finding denial of § 2255 motion appropriate

where it "stated only bald legal conclusions with no supporting factual allegations"). Thus,

Petitioner has failed to show that counsel erred by not raising this issue before the Court.

Moreover, even if the Court assumes that some unidentified agent(s) of the Government

did engage in improper conduct by speaking with Gill on more than one occasion, Petitioner has

still failed to show prejudice in this instance. Petitioner does not allege that Gill changed her

story to make it more compatible with the Government's case, nor does he allege that Gill

refused to testify truthfully if called as witness. Indeed, Petitioner's own allegations indicate

only that "Gill was feeling a little pressure." (ECF No 66, at 19.) Any pressure Gill may have

felt and the reasonableness of that feeling bears no relevance to the question at hand, because

Petitioner has failed to allege facts to establish prejudice insofar as Ms. Gill is concerned.

Petitioner's allegations concerning the FBI's interview of Salazar suffer from similar

deficiencies. Here again, despite submitting an affidavit from Salzar (ECF No. 66-4), Petitioner

fails to point to any specific conduct on the part of the Government that could be construed as

inappropriate. While Salazar states that the FBI "rigorously questioned" him about why he

would "want to hire someone who [was] in jail," and "insinuated that [he] was lying when [he]

expressed . . . interest in hiring [Jaramillo]," he fails to point to any specific questions or tactics

26

that could be viewed as inappropriate.  (*Id.* at 1-2.)  As was the case with the allegations concerning Ms. Gill, these vague and conclusory allegations fail to establish that any sort of impropriety occurred.  *See Sanders*, 373 U.S. at 19.  Given this fact, Petitioner has again failed to establish that counsel was deficient for declining to raise this issue to the Court, much less that he suffered any actual prejudice as a result.

Because Petitioner has failed to establish that counsel was deficient, that he suffered any prejudice as a result or that he is actually innocent of wire fraud, *see* Section II, *supra*, Claim Seven will be DISMISSED.

## V.  CONCLUSION

Petitioner's Motion for Leave to File Excess Pages (ECF No. 65) will be GRANTED. Petitioner's § 2255 Motion (ECF No. 55) will be DENIED.  Petitioner's claims and the action will be DISMISSED.  A certificate of appealability will be DENIED.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and send a copy to Petitioner and counsel of record.

                                                        /s/
                                        David J. Novak
                                        United States District Judge

Richmond, Virginia
Date:  February 16, 2021